We will see our argument next in number 14-1110. Pro In-Ray Papp Licensing Digital Camera Patent Litigation. Thank you, Your Honors, and may it please the Court. The District Court in this case recognized correctly that the focus of the claimed invention here is with the interface device's ability to dupe or trick a host device system into using its own software drivers to effectuate transfer of real files. In that way, that is how the claimed invention here solved the problem that plagued the prior art that used specialized driver software for this process. It solved the problem by eliminating that need for specialized driver software altogether. So Column 1 and the top of Column 2 says there are interfaces of two varieties. One was slow but flexible, one was fast but inflexible. Can you just flesh that out, help me understand in a little bit more concrete detail what that means? Sure. That is referring back to this core problem where you have specialized driver software. You could have driver software, the software used to effectuate this communication process between an interface and a host device, a computer system. And if you had some software that was specifically matched to communicate between the interface and the particular host computer at issue, for example, that could lead to problems about malfunctioning. Or it would be so specifically matched that it couldn't be used with other types of devices. Or conversely, if you had a broader type of specialized software, something that would apply or be able to be used with other devices, well that would have the problem then that it wouldn't be so optimally matched in a way that the data transfer would be slow. But the core point to take away from that is this problem with needing specialized driver software. And the solution, the core point to take away from the patents is the solution that's claimed. And the claimed solution is having the interface device that eliminates the need for this specialized software altogether. How? By having the interface device pretend or simulate itself to the host computer system, not by saying I'm an interface device and attached to me is a particular type of DTRD, but by saying, lying to the host computer, if you will, that no, no, I'm a customary device for which you, the host computer system, already have the driver software. That's how the invention here is claimed. That's the problem it resolves. And the fact that it can be used in different ways doesn't impose the variety of physically separate and distinct or physically readily attachable and detachable qualities that the district court erroneously imposed on various of the claim terms on issue. Is there a common understanding between the parties what the district court meant by the construction standalone? Does that mean the very same device must be readily detachable from X and easily plugged into Y? As a construction, constructions supposedly are supposed to actually make things clearer. This one seems to me not to move in that direction. So I'm curious whether everybody understands that this is what was meant by standalone. Well, on that point, Your Honor, I think the point is clear if you look at the district court's summary judgment opinion on what's titled as the memory cards. That's the decision, the summary judgment decision, that turned it directly on the interface device construction. And there the district court, I think it's fair to say, makes clear that it's imposing not just standalone, but also that it be separate and distinct, which is the way of saying that it has to be housed in a separate structure from the DTRD. The DTRD, the data transmit receive device, and the interface device by the district court's holding is that they have to be physically separate and distinct from one another. And in addition, Your Honor, they have to be readily attachable and detachable. And the district court used that language as well? Yes. And you can see that both with respect to its construction and the summary judgment opinions on interface device and with respect to second connecting device. So to impose not just the separate and distinct, separate and apart requirement, found nowhere in the claim language, but also readily attachable and detachable requirements. And further, it has to be separate and distinct, readily attachable and detachable, and it has to do all that with, quote, dissimilar DTRDs. That language, none of those requirements, none of those physical type requirements are found anywhere, are not imposed by the claim language. And just to clarify, another element of the construction is that no element can be part of the DTRD and the interface device at the same time, right? That's right. That was from the judge's summary judgment ruling on the memory cards, which was, for shorthand, that's the interface device summary judgment ruling. And that was, Your Honor, again, that turned on her construction, the district judge's construction, that they have to be entirely separate and distinct from one another. The claim language does not impose that requirement, and it's flat out contrary to this court's case law. In the cases we've emphasized in our brief, like NTP versus RIM. Can you talk about the passage in the specification that I guess I have been paying most close attention to, and that's the Column 8 passage? Sure. Explain why that's not a problem for you. It's absolutely not, and if I could begin, Your Honor, with the premise that the district court cited, what the district court recited as the legal rule that therefore made that into a claim requirement. And the district court referenced this court's case law where the specification makes use of the phrase, the present invention. Right, but we've also said it matters a very great deal what words come after the phrase, present invention, or what comes before. So I appreciate that that uses that phrase, but it uses it in a particular way that's maybe a little bit different from some of the other uses of the present invention. So specifically on the Column 8 passage, why is that not a problem? Sure, Your Honor, and pursuant to this court's case law, especially like absolute software, it's not a problem for four reasons. First, per absolute software in the present invention, there's not a uniform, consistent description of the invention that requires physically separate and distinct interface devices and DTRDs. And that's what this court case law requires. So that's point one. Point two is when you look at this present invention test, you have to look, of course, as Your Honor noted, to the specification and look to see whether there is, to quote absolute software, any suggestion to the contrary in the intrinsic evidence. And here, and even in this paragraph 8 alone, it's referring, there's plenty of indications that suggest otherwise. That it's not talking about the invention in its entirety. It's talking about a particular use, a particular embodiment, a use of this invention in the context of this multitasking situation where you can have, as an embodiment, the use of an interface with multiple DTRDs or multiple peripheral devices. And that paragraph 8 uses expressly that it's talking about an embodiment. And then to amplify that point further, it refers to the component numbers of referencing an embodiment, which this court has found significant in cases like Hill-Ron v. Stryker, where it indicated that the use of the component numbers indicates it's talking about an embodiment as opposed to the invention at large. And in that paragraph as well. If I could just picture this embodiment in my mind, would it be something like the interface device having four or five different pin connectors so that four or five different DTRDs could be plugged into the same interface device? Is that what this embodiment is describing? Essentially, yes. And there's an illustration of this kind of configuration, Your Honor, in the record, I believe, at 3298. But I'll double check on that. I think it's on the last page of the record, or one of the last pages, that illustrates this configuration where you can have multi-tasking or multi-branch embodiments. Let me double check, Your Honor, please, on that page. This? Is this what you mean? Yes. Or 3295? Yes, 3295, I believe, Your Honor. It's an illustration. That's right. Yep. And if I could continue, Your Honor, on that same paragraph, you have not only all these indications referring to this, this is really talking about a particular use or an embodiment for the invention for the reasons I just mentioned. And in addition, it's talking about particular embodiments itself. It doesn't talk about the processor, the plain term here. It talks about a particular embodiment of the processor, the DSP, the digital signal processor. And on that passage itself, as the defendant, H.P., agrees, that passage does not say the enormous advantage of having a separate interface device that is separate and distinct from a DTRD. As the defendant, H.P., agrees in its brief at page three, what that passage says is you're separating particular components of the interface device from one another. Because this phrase, communication unit, actually takes three of the four pieces of the interface device and gives it a new name, right, which hasn't occurred before in the spec, is that right? Off the top of my head, I'm not sure if it used that or not. But it does refer to the components that are implemented or the components that implement the communications unit. And it refers to the DSP, the first connector device, and I believe the memory. And what that is talking about is not having physically separate and distinct devices, but having interface components itself separate from one another in this embodiment where you can use the invention with multiple branches, multiple branch DTRDs. So at 2295, Mr. Battaglia, what is the interface device is what's labeled communication and the two blue boxes, correct? I don't have my color copies. I apologize, Your Honor. But yes, the ones that are identified as the communication unit with the second connecting device and then the second connecting device. That's the interface device. That's the interface device. That's right. I just want to make sure I was making the translation correctly. And I apologize. I don't have my color copies. But yes, that would be the interface device in that particular embodiment. And the important point that's emphasized in that passage itself, again, it's not physically separateness. In fact, that very paragraph says that the particular hardware symbolized here is not important. That can be modified, right? You can have a modification. That's not important. What's important is that the interface device operates in an identical fashion. It operates in the same way, even in this particular embodiment of multitasking, which goes back to what our core point is. The claims invention here has nothing to do with physically separateness. It has to do with the mode of operation. Every time it works in the identical fashion of telling a host computer system that it is not an interface device and it doesn't matter what type of DCRD is attached to it. It always dupes the host computer system by saying, no, no, I'm a customary device. Use your software drivers that go with this customary device to effectually data transfer. And that passage 8, column 8, 27 through 38, is just speaking again to that core point. And it's referencing back, you may have seen, Your Honor, in the discussion of the history or the background where it references the European patent, the EP patent we talked about in our reply brief, where you have this multitasking. And again, the prior art there, like the EP patent, had multitasking, but the problem came down to the same problem that the other prior art references. It still needed specialized optical matching driver software. There is a theme that the district court was pulling different pieces together. The judge had that one embodiment at column 8. Figure 2 talks about these pin connectors on that side of the interface device. And then the claim has this kind of interesting language about, regardless of the DTRD that's attached to the interface device. So there's some pieces there that the judge had to work with to pull out a theme that we're talking about maybe something that's a plug-and-play. A plug-and-play is a way it can be used, but under this court's precedence, if the ordinary meaning of the claim language doesn't impose these requirements, it can cover plug-and-play or a different type. It doesn't have to be permanently attached and detached. What does the language mean then when it says, regardless of the type of DTRD that's attached to the second connecting device of the interface device? To answer your question, this is speaking to the purpose of the invention. The interface device always operates by telling the host computer system that without any consideration of what's actually attached to the interface device or whatever the interface device itself may, if it was to be honest with the host device, it always tells that host device, that host computer system, that it's something else, a customary device. The regardless language speaks directly to that, this focus of the invention of the interface lying or duping the host computer into using its own driver software. That's what the regardless language speaks to. There's nothing about that language that you can reasonably tease from it, certainly not the ordinary meaning, that would therefore impose these separate and distinct requirements and other physical attachments. What if any aspects of the specification suggests an embodiment other than the plug-and-play? You have one argument that says, this is the ordinary meaning of the claim language, that governs unless there's something to the contrary. I suppose I would say, okay, that's one thing we want to think about, but we also want to think about what is being shown in the specification. The Column 8 business gives an example of, you might think of it as plug-and-play, but in any event, it presses a little bit for the theme that the district court adopted. What in the specification runs the other way? If I could answer that in two ways, Your Honors. The first way would be in the specification, when it treats the word attached, and that's what the district court placed a lot of emphasis on for her conclusion that these devices have to be separate and distinct from one another and they have these other requirements. Of course, as this court has already held in NTP, attached doesn't mean they have to be separate and distinct. Moreover, in the specification, you can see in Column 5, for example, when it's talking about components or other devices being attached to one another, it's describing those components in the context where, of course, I don't think there's any dispute that they can be permanently attached to one another and they can be permanently attached to one another within the same physical housing, the same physical structure. Where are we on Column 5? Your Honor, I believe it begins below. This is for the 399 patent. Beginning, Your Honors, around line 48 of Column 5, where it talks about the detailed description of preferred embodiments. By the way, that's an important point, too, with respect to Column 8 because that's speaking to everything they're after. In all caps, it's being described as a detailed description of a preferred embodiment, not the invention. But anyway, in that section, Your Honor, and I'll just paraphrase it, it's talking about the components for the interface device, such as the first connecting device, the second connecting device, being attached to the DSP or the processor or the memory. Those components for the interface device being attached, and I don't think there's any dispute that that's saying that it can be attached permanently, and they're attached permanently within the same structure. So it's using attached in a way that is completely consistent with this Court's case law. And I'll note, as well, that the prior art and the discussion of the prior art, in addition to emphasizing that the problem there is with this need for specialized driver software, it does talk about an embodiment, I think it's at the top of column two, where it talks about an interface that is installed inside a host computer. So that's sort of pointing to the notion that this idea of separateness and whatnot, that's not what's really important here. It's emphasizing the theme, if you will, Your Honor, throughout what the specification actually teaches. And the theme is the invention's ability to eliminate the need for specialized software. That's what the specification focuses on. And that's a further reason why the District Court's construction on this term, and the other terms, DTRD especially, there's no claim requirements speaking to DTRD. Can I ask you a question on a topic we haven't discussed, as you're running out of time? What construction of virtual file systems do you want us to adopt? So I don't have the definition. I know you disagree with the District Court's view about no actual storage on the interface device, right? But what would be the alternative construction that you think should be adopted, if that one were to go away? The correct construction should be, Your Honor, that the virtual file system is speaking to what the interface device can further simulate itself as to the host device. That is part and parcel of the core idea here, that it is lying or projecting, simulating itself as a customary device for which the host already has drivers. So a virtual file can be a physical file that the host device believes resides on its own host file system, but it actually resides somewhere else? Is that kind of... But it's duped into believing it's on its own host system, but it's actually somewhere else with the interface? It's duped into thinking that the customary device, the signaled hardware device that's being projected to the host device, also has this file system. Not a real file system, a virtual file system. That's what further dupes the host device into okaying, to agreeing, that this is a customary device. Let's use our drivers. Because as the specification for the 449 patent and the 399 patent teach, the host device may have additional follow-up questions or additional queries here about what's being attached here. And this is just speaking to the same core idea, that it's projecting itself, appearing as a customary storage device, and oh, it can also simulate that we have virtual file systems. That has nothing to do with whether or not the interface device can store physical, real files on it. Nothing to do with that. Okay, but when you say simulate virtual files, where are the virtual files? The virtual files, in the district court's analysis, she referred to a preferred embodiment, which is another error. But she referred to preferred embodiments as files from which the interface device system would derive data and then have that data, as I understand it, projected to the host device. But I think as the proper construction, and the simple way of understanding this, is that the virtual files, again, is just another thing, another way that the interface device dupes. Another thing that this interface device pretends that it is to the host device. So the virtual files are not real files. This is something that it is simulating to the host device in order to effectuate the transfer of real data files over at this side from the DTRD and then on to the interface device where those files can be stored on the interface device's memory. To claim expressly besides the memory. So your construction is the real file originally resides in the DTRD and then the DTRD transmits that real file to the interface device. And then the interface device ultimately transmits it to the host device. And the host device is under the impression that this real file is coming from one of the customary input-output devices that it works with. Is that what's going on? Almost. Almost. I was with you all the way until the end, Your Honor. I think the last point is that the host device, in using its software drivers, is duped into using those software drivers because it is seeing a customary device that has these virtual files. And therefore, by virtue of that, it's OK and it's approving this process of using its drivers that then engage in this process. By doing that, that's what results in having the real data files transferred from the DTRD on to the interface where it can be stored and kept. And then later on, the real files can be transferred to the host device system. That's the entire purpose of the invention, and that's what the claim language recites. I'm sorry, just one more question on this. If it was, in fact, just a customary input-output device that was hooked up to the host device, let's forget about your invention for a second. OK. We'd be still talking about virtual files. And so what your invention is doing by duping the drivers of the host is to simulate the virtual files. That's right. I think that's right, Your Honor. We'd still be talking, if it's a real customary device, we'd still be talking about real files that the host computer would be asking about. Real files, yes, but would we be calling them, referring to them as virtual files? I think the answer to that is no. And I think the answer is no because it's still part and parcel of the idea, and I don't know if we're crossing paths here on between simulating and virtual files. I think they both go to the same premise here, that they're simulating or duping the host device system into thinking that there's really the requisite showing that this is really a customary input-output or customary storage device for which, OK, it's OK if we use the host device's software to effectuate data transfer. Since we've just been talking about customary devices hooked up to, it seems like an opportune time to recall that the claim phrase uses a different word, in. That's right. And you rely very heavily on a specification passage that refers to printer devices, which in the specification suggests that this input-output device doesn't have to be inside the same box as the computer processor. What, if any, definition implied meaning, and I'm just asking now a linguistic term, a purely linguistic term, because I understand your specification argument. How do you get a version of in that encompasses this? A couple ways. Sometimes we say, never mind the language, the spec is clear enough. Put that possibility aside. I'm trying to understand, is there some version of in where there's a kind of implied other words that aren't stated, hence they're implied, that give you the meaning you want? Yes, and if I could answer the question, Your Honor, by reference to what this court has done for a phrase just like this. Even more stringent, you can say, in Pickles. The Pickles v. Rainbow Technologies case. There the claim language was talking about a peripheral, quote, located in the computer. Located, located in the computer. And what recognized that the word in was there, it still held that because the specification disclosed one example of a peripheral that was outside, if you will, external, attached to the host computer system, then the construction that excluded that peripheral, that disclosed example, was erroneous. And here we don't have one, we have multiple. It's not just printer devices, as Your Honor pointed out, but indisputably other devices disclosed in that paragraph, it's column 4, 27-38, talking about CD-ROM drives and tape drives, other peripheral type devices that the district court agreed, said directly in her plain construction opinion and in her summary judgment opinion, that these are the types of devices, the types of peripherals that are disclosed in the specification as being customary for which the host device will have drivers. But nonetheless... Did the district court say, putting aside printer, talking about the CD-ROM and the tape drive, did the district court say or is there agreement among the parties that in, what is this, 1996 is the priority date here or something, that those were customarily outside the box? I don't recall that the district court said that or that there's agreement on that. There's agreement on that these devices are... Right, they're certainly listed, but I mean, the mileage you need out of it is for at least one of those, like printer, to be outside the box. Yes, the answer to your question is yes, Your Honor, they're indisputably outside the box, those types of accessories, those types of peripherals. And the district court, that's what the district court's own opinion, I'll use the word loosely, found when addressing this claim term. Referred to those other listed devices as outside the chassis or boxes. That's right, that's right. But with error, I think as Your Honor was alluding to, under this court's case law, he says you don't just read a claim term, especially just one out of the claim limitation, it's just not the word in. It's customary in a host device, you have to read it in context and, of course, in context of the entire specification. And in addition to excluding several disclosed examples, the district court violated this court's case law by elevating a dictionary definition of the word in over the teachings of the specification. And this court has made clear that that is a plain error, so to speak, of claim construction, elevating the dictionary definition over what the specification itself teaches. Mr. Battaglia, I think we should finally give the other side a chance to speak. Thank you, Your Honor. Two chances. Ms. Morrow? Ms. Kaposha. Oh, I've got the sequence backwards. Okay. Ms. Kaposha. Good morning. May it please the Court. I'm arguing today on behalf of the camera manufacturers except for HP, and I'd like to make three principal points, and if you agree with us on these three points, then you have to find that Judge Collier's judgment should be affirmed, and you don't have to reach the other issues. First, under any construction of interface device, PAP doesn't dispute that memory cards don't satisfy the DTRD limitation, and the memory card summary judgment ruling should be affirmed. Second, PAP should be held to the construction for data transmit-receive device. It invited Judge Collier to adopt. On that second point, tell me if I'm wrong. I understand the second point to be that in order for PAP to have preserved its construction, it had to argue the point twice to the district court once after the district court had rejected it. I don't think that's exactly right. I think when PAP submitted its motion for reconsideration to the court on this term, it said you have now made an error, not an error that we have previously discussed. It focused on that error, and the district court said, right, I messed up, I need to fiddle a little bit with the transmission-receive business, but you're saying that in order to preserve the construction that it actually submitted in the primary round of claim construction briefing, it needed to pester the district court a second time? I'm not saying that. In its motion for reconsideration, when they asked the court to adopt the construction that's adopted now, they unqualifiedly asked for that construction. They didn't say we'd like to reserve the ability to go back later to ask for our old construction. We're okay with the construction there is now. We just want to change this one thing. And they left standing the language when connected without making any arguments about it or noting it in any way. And so Judge Collier then adopted the construction as they modified it, and it was only upon having summary judgment granted against them regarding that construction that they came to want to change their mind. The third thing that you can decide if you put these three things together and affirm Judge Collier's judgment is that basically in means in, not in or out. Deciding those three things is all that's required, and after that you don't have to get to the other terms. When the conversation started today talking about the construction of interface device, there was a lot of discussion about whether there is a uniform theme or consistent description in this specification or in this patent about whether the interface device needs to be standalone from the other two main devices. And there is absolutely a uniform theme, and it starts with the claims. The claim terms make clear that the interface device is separate and distinct, standalone. How do the claim terms do? I think you rely on the regardless phrase, and I guess I'm having trouble understanding why that phrase wouldn't perfectly, as a linguistic matter, read on circuitry that can be permanently affixed to any of a number of different data devices. That claim language that's in every claim, regardless of the type of data transmit receive device attached to the interface device, that language means that there has to be the ability to attach different things. If there's not the ability to attach different kinds of DPRDs, then there's no point to the language. I think the way that PAPS is proposing it, you could just cross that term out. It wouldn't matter. It could say regardless of the day of week. I think they have an understanding of that phrase, though, that's consistent with their understanding of what they believe is the theme of this presentation. Which is, we don't care about the identity of the DPRD on the back end, because what matters is we're going to be using the drivers in the host system, because we are going to dupe the host into believing that this DPRD slash interface device combination is a customary input-output device. It is correct that that's part of the invention. That's one end of it, is the notion that the host device will use drivers that are customary in it, the drivers that it already has. But there's also the other side of the invention, which they leave out. And that's the part that is brought in with this regardless language. The regardless is about what's attached on the other side of the interface device. It can be any of a number of things that's found in this claim language, but it's also supported throughout the specification. There's many, many different places in the spec where it confirms that part of the way this language should be read is to find that the interface device is meant to be able to attach to many different types of devices. Throughout the specification, they use the term, the present invention, to describe this device as being able to attach to multiple different kinds of DPRDs. They do it in several different places of the patent, including starting from the very beginning, from the very first words in the patent to the very last words just before the claims. And those words are, when describing the interface device according to the present invention, it provides a universal solution which can cover the entire spectrum of possible data transmit-receive devices. Those are the last words in the patent. Similarly, in column 7, lines 45 to 49, the patent provides that technicians can use the interface device according to the present invention as an interface between a host device and almost any data transmit-receive device. Tell me again why those two things in particular don't have the same perfectly easy understanding that I tried to articulate with respect to the regardless language. Same device affixed in data device 1, affixed in data device 2, affixed in data device 3, you're never going to take it out because it's soldered or whatever it is. It doesn't have to have multiple data devices attached to it. It doesn't have to be readily detachable. I mean, it is attachable to anything, but once you attach it, why doesn't that language perfectly cover that? It says, here's something that any designer of the system, no matter which of the data devices they're creating, can use the same thing and then solder it in. Because under the language of the claims and the language in the spec, it's always said that this interface device has to be able to attach to multiple things. The flexibility throughout the patent... This is what I'm trying to understand. Why isn't what I just described a data device that is attachable to multiple different things, one at a time and permanently to each one? An interface device is attachable to multiple different things, one at a time and permanently? Yes. Under the claims, it does require that there has to be multiple things that you can attach, and there's a lot of different language in the spec to look at. Another thing to look at is a part that you were pointing to previously in column five that talks about the various devices being attached. In that description where Mr. Battaglia pointed out that it uses the terms attached to also talk about the interface device being attached to the host device and to the DTRD, but in both of those examples, it says it can be attached. It doesn't say it is attached. It doesn't say it's always attached. It says it can be attached. In the other examples where it's talking about things internal to the interface device, when it's talking about the digital signal processor or the memory maze, it uses the words attached, is attached. Similarly, similar statements were made during the prosecution history, which also confirms this as well, where when the applicant was describing his invention in an attempt to distinguish prior art, he noted while he was describing the invention that it is clear that the DTRD, to be connected to the second device, connecting device of the subject interface, provides analog data. He recognized that the device was meant to be something that's to be connected to the data transmit and receive devices, not something that's captured permanently by them. Additionally, Your Honor has asked previously some questions about the device's customary claim term, the term in which the camera manufacturer's construction and the construction adopted by the court uses the fact that the claims say in. In this case, in means in. It doesn't mean things that can be in or out. What's your view of the, what is it, Column 4 passage? One is the general question about the printer devices, and the other, maybe just start with this very specific thing that we were discussing earlier. Is it understood, agreed, or found by the district court that the tape drives and the CD-ROM drives would have been external to the host device chassis at the time? No. Okay. There's nothing in the record that I can recall where there would have been that agreement. Indeed, at that time in 1997, it would have been perfectly common to find those things in a host device, in a computer. This section that's pointed to by Mr. Battaglione that you discussed previously in Column 4 is concerned with whether the drivers are found in the host device, because that is part of the invention. The invention has to use drivers that are found in the host device. In giving the description that includes the printer driver, it's describing drivers that are typically found in host devices. However, when it goes on to talk about the types of devices that the interface device can simulate to the host device, now it refers to first the hard disk driver as the preferred embodiment, and then it notes that other storage devices can be used. The devices that are described in the patent as the ones that can be simulated to the host device are storage devices, hard disks and other kinds of storage devices. Nowhere in the patent is there any disclosure of being able to simulate a printer to the host device as the type of device that the interface device is pretending to be. There's no disclosure in here anywhere that would explain how that would work or that describes that. Printers are described only in this one example as a typical type of driver that would have been found in a host device at that time. So the claim language is input, output, device, customary, and a host device? Yes. And this sentence, which says drivers for input, output, device, customary, and a host device, it feels like this sentence is, or the claim language is echoing this sentence. So that input, output, device, customary, and a host device is sort of, you smash all that together and just think of that as one thought. And so now you have a driver for that one item. And then when it talks about essentially a driver for a printer device, you can replace printer device with input, output, device, customary, and a host device, which is the exact phrase used in the claim. In the sentence that Your Honor is talking about, it appears that the language that is referred to, customary and a host device, is really meant to refer to the driver. It's what's normally present in most commercially available host devices. And this section, that's what it's concerned with, whether the drivers are available. But in the claim, when it says customary and a host device, it's referring to the input, output, device, right? Yes. We know that. Yes. So that's why I'm saying, because this sentence is using the identical phrase that's in the claim, that's why it stands to reason that customary and a host device, in this sentence in the text, is likewise referring to the input, output, device. In the claims, they also include the phrase driver, customary, and an input, output device. And that's the phrase that's really coming from this paragraph. That's what the paragraph is really concerned with. It's concerned with whether the driver is in the host device or not. It's not concerned with whether the device being simulated is. But when you get to the claim language, the claim language is clear. The claim language just says an input, output, device, customary, and a host device. It could have said an input, output, device for which there are drivers, customary, and a host device, but it doesn't say that. It uses the phrase input, output, device, customary, and a host device. Where's the phrase that you referred to about how a driver is driver, customary, and a host device? In the preamble of Claim 1, which comprises drivers for input, output, devices, customary, and a host device. And then that same phrase was also used in Column 4. The very next sentence after the sentence we were talking about in Column 4 then refers to the drivers for input, output, devices, customary, and a host device. If your honors have no further questions for me, I have nothing further to add. Thank you very much. We'll hear now from Ms. Mel. Thank you, Your Honor. With respect to HP, we'd like to turn to the construction of second connecting device. As for HP, there are two paths to affirmance. One is the one outlined for the other camera manufacturer, and the other is just to affirm the district court's ruling on second connecting device, which was the basis for the judgment entered specifically as to HP. Can I ask you, why does the second connecting device issue not stand or fall with the interface device question about stand-alone versus not stand-alone? Because the language is different. The claim refers separately to an interface device and then to the second connecting device that interfaces with the interface device. So we need to look at the construction of the second connecting device as a separate element in the claim, separate and apart from the interface device. And we would submit that with regard to second connecting device, the approach is a little different. Just to clarify, are you suggesting that it's possible to have two different outcomes on interface device and second connecting device? Or is it just a matter of logic? They have to stand or fall together. I don't believe they have to stand or fall together because the court is conducting an analysis of what two different claim terms in the claim mean and what the scope is of the interface device to which the second connecting device is attached, to which the DTRD is attached in one instance, or is looking at what the second connecting device itself is and how it's attached to the DTRDs. So I think we're looking at three separate structures in the claims and certainly three separate structures in the embodiments. With respect to the second connecting device, Pabst below agreed that this was a circuit device used to couple the DTRD to the interface device. And they also argued in their claim construction brief below, and this is in the record in A1478, that it shouldn't be limited to a mere connector, but should include additional circuitry. And so what we had at the district court was Pabst agreeing that the second connecting device was a hardware device used for this coupling purpose and that it contained at least a connector as well as the other elements that are recited in some of the claims. We submit that Pabst's argument now that the second connecting device doesn't do anything other than interface the interfacing device is a change in its claim construction position from what it argued to the district court and not something that it should be permitted to argue here. With respect to the construction of second connecting device, with respect to detachability, I believe Mr. Battaglia's primary argument was based on a reading of figure one as indicating that there was some kind of hard wiring there and that it was somehow not in dispute that that wasn't detachable. That's not at all the case. In fact, at the district court, Pabst submitted an expert declaration where it said that that figure, figure one, is a high-level block diagram that doesn't show, and I'm quoting from their expert, whether anything can be readily attached or detached. And that's in the record at 1174 to 1175. So I think the agreement at the district court level was that figure one is a high-level block diagram. It shows the general functional structures of the invention, but the communication lines in figure one do not represent an indication of hard-wired lines between the interface device and the second connecting device. Instead, figure one then refers to figure two for its teachings and, as the court noted, figure two has the individual connectors. With respect to the detachability issue, we submit the district court was correct. The claim both requires that there be this separate structure of a second connecting device and that it be attached to the data transmit-receive devices. So this isn't like the case of RIM that they cited where the only word at issue was connection. There's both an idea of a specific device, a second connecting device, and the notion that it's attached to other devices and that all of that should be given meaning in the claim. And we think that the approach PAPS is taking of saying this is just some kind of an interface to the interface device doesn't make any sense because the claim talks about separately a second connecting device and that interfacing with the interface device, and so they're basically just giving the second connecting device no additional meaning. And we know the presumption is that the applicant used the additional term second connecting device to describe a separate structure, and we submit that PAPS originally agreed that that was a hardware structure that at least included a connector and that that's a construction that is consistent with the district court and it should be affirmed by this court. I'm watching my clock tick down. Wow, thank you. You gave me five minutes. I did my best. I have five seconds left. And the court has no questions in my last five seconds. Thank you, Your Honor. Three minutes. Thank you, Your Honor. And I'll work backwards and try to hit what I think are probably the points, Your Honors, we're focusing on, and that is first with respect to this idea about the second connector device and whether or not it turns on the interface device analysis and whether it has to be separate and distinct. And the correct answer, I believe, to that question, Judge Chen, is yes, it does. Yes, it does to which? It does turn on the same analysis with respect to interface device, I'm sorry, because that construction turned on the same emphasis about column 8, and the district court emphasized this column 8 discussion about an embodiment where there's an enormous advantage in this multitasking application. So why does figure 1, why does the interface device have a first connecting device and a second connecting device? What's the point of those? That are then further illustrated in figure 2 as pin connectors. Right, and I hope to clarify, there's no dispute, there shouldn't be any confusion, if there is, my apologies. That is a physical structure. It is a physical structure. What it doesn't require, what this term doesn't require, are all the things, the physical qualities that aren't anywhere in the claim language. That's the qualities about a second connecting device that has permit a user to readily attach and detach an interface device. Well then, let me ask the question differently. What else could those first connecting and second connecting devices be doing other than providing this attachability, detachability function? Well, with respect to second connecting device, for example, it includes not just this physical structure for connecting, so to speak, but also includes the converter and the sampler that's recited in the claim language. Those are the components of the invention for the 399 patent that sampled the data, the analog data provided by the DTRD and then converted it into digital data. So it's not just this notion that, oh, we're just turning this into some sort of nonce term that doesn't require anything. No, it's a physical structure and requires what the claim recites it requires, the converter and the sampler, for example. But it doesn't require that the user has to be able to readily attach and detach it and has to be able to readily attach and detach it to a plurality of different DTRDs. That construction is wrong for all the same reasons that the interface device construction is wrong. It's not in the claim language, and the specification doesn't evince a clear disclaimer or a clear lexicography that could impose these requirements. And so at the end, you're left for that construction, the same reasons you're left with the interface device construction, with these additional requirements that are just not required by the claims and that the specification does not impose. And that's why they both should be reversed, as with the other claim limitations as well. My red light's coming on, but I'll just briefly sum up that the court should reverse all five terms. Each of the constructions violates this court's core principles that claim construction terms foremost in what the claim language requires, and you cannot import descriptions of embodiments or examples into the claim so restricted. Just as a thought exercise, what if we agreed with you on interface device, but we also agreed that you can't have an element that overlaps in that it's both in the same element can serve as part of the DTRD as well as part of the interface device? Would we affirm the summary judgment on that theory, but remand back for the original claim construction and infringement contention theory? I think the answer under this court's precedent is that unless it's the rare case where a reversal, a change of claim construction, wouldn't require a remand, that fixing the interface device construction should be remanded back to the district court to address in the first instance because with respect to this case in particular, the court's interface device summary judgment ruling, the memory card ruling, didn't turn on any straight legal notion that the components have to be separate from each other as a matter of law. It turned on her claim construction analysis, erroneous, that the interface device must be separate from the DTRD, and because that decision was wrong, the whole aspect relating to that summary judgment should go back as well, and that's consistent with this court's case law. And by the way, that ruling, if reversed, doesn't address the original infringement contentions that Pat set forward, that the DTRD could also be the internal image sensors that also act as a data transmit-receive device. So fixing that claim should require a reversal altogether. Thank you very much. Thank you, Your Honor. The case is submitted. All rise. The Honorable Court is adjourned until tomorrow morning. It's at o'clock a.m. Thank you.